**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| DAVID ZHOU A/K/A ZONGDE ZHOU | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 09-CV-01516- AW |
| | * | |
| METROPOLITAN LIFE | * | |
| INSURANCE COMPANY | * | |
| | * | |
| Defendant. | * | |
| | * | |

**************************************************************************

**MEMORANDUM OPINION**

This case arises from the denial of coverage for long-term disability benefits after

Plaintiff David Zhou, an employee of American Computer Technology, Inc. (hereinafter

"ACT"), was diagnosed with a depressive disorder and filed an insurance disability claim.

Pending before the Court is Defendant Metropolitan Life Insurance Company (hereinafter

"MetLife")'s motion for summary judgment, Doc. No. 33, and Plaintiff David Zhou's cross-

motion for summary judgment, Doc. No. 36.  For the reasons that follow, the Court DENIES the

parties' cross-motions for summary judgment and REMANDS Plaintiff's claim to the plan

administrator for a full and fair review consistent with this Memorandum Opinion.


**I.      STATEMENT OF FACTS**

   A.      Plaintiff's Employment And MetLife's Disability Plan

On August 25, 2005, ACT hired Plaintiff as a Senior Consultant. Administrative Record

(hereinafter "AR") at 585.  According to Plaintiff's job description, Plaintiff worked forty hours

a week plus overtime, totaling sixty to sixty-five hours a week.  AR at 489.  His job required the

1

ability to concentrate and think clearly to formulate and define software systems, manage projects, and create objectives for projects. *Id.* Specifically, Plaintiff's job duties required excellent memory skills, mental clarity, and the ability to manage deadlines and projects, create project details, analyze several components at one time, and problem solve. *Id.*

Plaintiff, through a group policy provided by ACT, was a participant in MetLife's Long-Term Disability Insurance Plan (hereinafter "Plan" or "Benefits Plan"). MetLife funds long-term disability insurance as provided under the Plan and also serves as the Claims Administrator. Plaintiff's coverage under the Plan became effective on September 1, 2005. AR at 646. The Plan provides in pertinent part:

## LONG TERM DISABILITY BENEFITS (AR at 678)

**A. Monthly Benefit**
You will be paid a Monthly Benefit, in accord with Plan Highlights, if we determine that:
1. You are Disabled; and
2. You became Disabled while covered under The Plan.[1]
* * * *

## BENEFITS CHECKLIST (AR at 677)
In order to receive benefits under This Plan you must provide to us at your expense, *and subject to our satisfaction*, all of the following documents . . .
1. Proof of Disability
2. Evidence of continuing Disability
3. Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability
4. Information about other income benefits
5. Any other Material information related to your Disability which may be requested by us.
* * * *
## DEFINITION OF DISABILITY (AR at 680)

---

[1]The Plan additionally has a ninety day "elimination period" which is a period of time during which no benefits are payable. During the elimination period, a plan member must be under the continuous care of a physician.

"Disabled" or "Disability" means that, due to sickness, pregnancy, or injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and you are unable to earn more than 80% of your Pre-disability Earnings or Indexed Pre-disability Earnings at your Own Occupation for any employer in your Local Economy . . . ."

\* \* \* \*

## LIMITATION FOR DISABILITIES DUE TO PARTICULAR CONDITIONS (AR at 688)

Monthly benefits are limited to 24 months during your lifetime if you are Disabled due to a:
    I.   Mental or Nervous Disorder or Disease, unless the Disability results from:
         a.  schizophrenia;
         b.  bipolar disorder;
         c.  dementia;
         d.  organic brain disease.

"Mental or Nervous Disorder or Disease" means a medical condition of sufficient severity to meet the diagnostic criteria established in the current Diagnostic and Statistical Manual of Mental Disorders. You must be receiving Appropriate Care and Treatment for your condition by a mental health Doctor.

\* \* \* \*

## DOCUMENTATION OF CLAIMS (AR at 692-93)

At your expense, you must provide documented proof of your Disability.
Proof includes, but is not limited to:
    1.  the date your Disability started;
    2.  the cause of your Disability;
    3.  the prognosis of your Disability

You will be required to provide signed authorization to obtain and release medical and financial information, and any other items we may reasonably require in support of your Disability. These will include, but are not limited to:

    1.  Proof of continuing Disability. . .

\* \* \* \*

B.    <u>Events Leading Up to Plaintiff's Disability</u>

In December 2005, Plaintiff's mother died from undiagnosed cancer. AR at 424. On

December 23, 2005, Plaintiff took two weeks leave of absence to attend the funeral in China.

3

Plaintiff alleges he planned to return after the two weeks but became depressed in China and was too sick to leave. AR at 717. Plaintiff remained in China and began seeing Dr. Wang Wei, who diagnosed Plaintiff with depressive disorder and proscribed Prozac, Valium, and Nimodipine for treatment. AR at 491-93. Plaintiff remained in treatment under the care of Dr. Wei until March 30, 2006, when he returned to the United States. *Id.*

On May 22, 2006, Plaintiff sought treatment for his depression in the United States with Dr. David Grodsky, M.D., of Threshold Services Outpatient Mental Health Center (hereinafter "Threshold Services"). AR at 664-66. Threshold Services is a reduced-fee clinic for adults with mental disorders. At that time, Plaintiff also began seeing Bonnie Jones, a Licensed Certified Social Worker-Clinician for Threshold Services. AR at 629-35. Over the two-year course of his treatment at Threshold Services, Plaintiff suffered a number of symptoms, including depressed moods, dizziness, decreased energy, poor concentration and memory, lack of motivation, isolation, panic attacks, and high anxiety.[2] In sum, Plaintiff had regular weekly, monthly and sometime bi-monthly appointments with Threshold Services, and his doctors prescribed a number of medications including Klonopin, Seroquin, Lexapro, and Cymbalta to help with Plaintiff's depression and other related symptoms. Plaintiff saw Dr. Grodsky until June 13, 2006. AR at 713. Dr. Andres Olaciregui, M.D., took over in June 2006 and became Plaintiff's treating physician. *Id.* Plaintiff subsequently received treatment from Drs. Brian Zimnitzky and Abby Morris from around April 10, 2007 to January 22, 2008. AR at 99-112. On September 26, 2008, Dr. Morris diagnosed Plaintiff with Bipolar Attentive Disorder, General Anxiety Disorder and paranoia. AR at 26.

---

[2] The Court notes that not all of these symptoms were experienced at one time but rather over the course of 2006. At times, Plaintiff only indicated a lack of concentration when watching television. AR at 717-18. These symptoms are a synopsis of what Plaintiff experienced throughout the course of his illness.

MetLife became aware of these medical records and diagnoses supporting Plaintiff's condition in a piece-meal fashion during its four reviews of Plaintiff's claim for disability benefits. Because the Court is limited to determining whether MetLife's denials were reasonable based on the information available to MetLife at the time, the Court will proceed to discuss in depth the information available to MetLife at each juncture in which it denied Plaintiff's claims for long-term benefits.

  C.  <u>MetLife's Initial Review of Plaintiff's Claim</u>

  On April 2, 2006, Plaintiff faxed a long-term disability employee statement form and an Attending Physician Statement ("APS") to MetLife. AR at 668-70. The APS submitted was that of Dr. Wei, who had treated Plaintiff in China. *Id.* The APS stated that Plaintiff had depressive disorder with symptoms including headaches, dizziness, depression, poor concentration and poor memory due to headaches, dizziness and insomnia. *Id.* Dr. Wei stated that "it would take one to two years to cure this kind of illness" and referenced SAS, SDS and SCL-90 charts, although these charts were not provided. *Id.* Plaintiff also submitted an APS from Dr. Grodsky at Threshold Services. The APS stated that Dr. Grodsky diagnosed Plaintiff with major depression and indicated that Plaintiff had "too little concentration currently" to return to work.  AR at 665.

  On July 17, 2006, Plaintiff faxed an employer statement to MetLife at MetLife's request. AR at 711. The employer statement contained a brief job description in which Plaintiff's employer indicated that Plaintiff's position entailed working forty hours per week plus overtime. AR at 654.  The statement indicated that overtime was regularly required and that the job requires moving equipment and/or other machinery from time to time. *Id.*  The statement also

noted that frequently, up to 88% of the time, is Plaintiff required to encounter interpersonal relationships necessary to perform the job. *Id.*

On July 18, 2006, Plaintiff called MetLife to confirm that it received the employer statement and to inquire if there was any additional information that MetLife needed. AR at 711. MetLife advised Plaintiff that it had received the employer statement, that nothing else was needed at this time and that once the review was complete, the case manager would advise Plaintiff if MetLife needed anything else. *Id.*

On August 3, 2006, after two previous attempts to get in contact with Plaintiff, MetLife faxed a request to Dr. Olaciregui's office and asked that he return an enclosed questionnaire that MetLife needed in order to assess Plaintiff's disability. AR at 713. MetLife specifically required information such as initial and ongoing documentation of Plaintiff's current psychological condition, a current diagnosis, a GAF score,[3] treatment plan, medication regiment, current clinical symptoms, return-to-work plan, estimated return-to-work date, and any specific cognitive and functional impairments that would support Plaintiff's inability to return to work. *Id.* MetLife requested that Dr. Olaciregui return the form by August 17, 2006. *Id.*

On August 4, 2006, Plaintiff called MetLife and informed MetLife that he could not retrieve any more information from Dr. Wei because China did not have a policy of keeping medical records of outpatients. AR at 608. On August 7, 2006, MetLife spoke with Plaintiff and scheduled a time for MetLife's psychiatric specialist to conduct an initial interview. AR at 713. MetLife failed to notify Plaintiff during the call that additional records from Dr. Olaciregui's office were still needed. *Id.*

---

[3] The GAF stands for General Assessment on Functionality. *See Scott v. Barnhart*, 332 F. Supp. 2d 869, 874 n.3 (D. Md. 2004). The GAF score is used to report the clinician's judgment of an individual's functioning. *Id.* A score below 50 shows a serious impairment in functioning. *Hensley v. Eastman Long-term Disability Plan*, No. 1:01cv00122, 2002 WL 731765, *4, fn. 1 (W.D. Va. 2001).

On August 15, 2006, MetLife's psychiatric specialist interviewed Plaintiff over the phone. AR at 717-18. During the course of the interview, Plaintiff stated that he had become depressed in China following his mother's death; that he had had difficulty falling asleep and experienced occasional thoughts of self-harm and suicidal inclinations without plan or intent. *Id.* Plaintiff stated that he began treatment with Dr. Wei and saw the doctor about every one-to-two months. *Id.* Plaintiff also stated that he was currently homeless and living in a shelter due to lack of funds, and he spends the day sleeping.  *Id.* Plaintiff alleged that he no longer experiences suicidal inclinations or hallucinations, he sleeps better, and his thought process was clear and goal-oriented other than the fact that he still has difficulty concentrating while watching television. *Id.* Plaintiff reiterated that he could not provide further medical documentation from Dr. Wei aside from the APS form he had already submitted. *Id.*

On August 31, 2006, based on Plaintiff's phone interview with the psychiatric specialist and the documentation received from Plaintiff, MetLife denied Plaintiff's claim for long-term benefits. AR at 456. MetLife indicated in its denial that there was not enough objective medical information to conclude that Plaintiff had a serious psychiatric disorder that would prevent him from performing the essential duties of his occupation. *Id.*  The denial letter also stated that both Dr. Wei and Dr. Grodsky did not indicate a return-work date and that Dr. Olaciregui had never sent office notes or filled out the psychiatric questionnaire. *Id.* MetLife further cited the lack of mental status exams or recent symptoms documented to support restrictions on Plaintiff's functionality, and noted the lack of office visits or progress notes to document his being continuously disabled from his last date of work. *Id.* Finally, the denial letter stated that Plaintiff had the right to appeal within 180 days, or until February 27, 2007. *Id.*

D.      MetLife's Second Review of Plaintiff's Claim

On September 14, 2006, MetLife received medical information from Bonnie Jones, the

Licensed Certified Social Worker-Clinician at Threshold Services. AR at 720. Those forms

provided treatment notes indicating that Plaintiff experienced trouble falling and staying asleep,

felt like he could not breathe, experienced crying and sadness, and had a lack of energy or

appetite and poor concentration. AR at 629-35.  The treatment notes also provided a current GAF

score of 32, suggesting a serious impairment in functioning. *Id.* Upon receiving these notes,

MetLife sent a letter to Plaintiff stating that it had received the medical information, but that if

Plaintiff wished to appeal MetLife's decision, he would have to follow the instructions in the

August 31 denial letter.  AR at 626.

On or around January 8, 2007, Plaintiff retained counsel to represent him on appeal. AR

at 721.  Plaintiff's attorney called MetLife on January 12, 2007 and requested that MetLife

forward the entire case file and diary notes. *Id.* On February 18, Plaintiff's attorney asked

MetLife for an extension, which MetLife granted. On March 27, 2007, MetLife received

Plaintiff's appeal, along with additional medical documentation. Plaintiff included a more

thorough job description, AR at 489, and additional medical records, including:

- An initial evaluation form, which included a mental status examination performed by Ms. Jones on May 22, 2006;
- Psychiatrist evaluation/medication rationale dated May 24, 2006; medication records from May 24, 2006 to January 2, 2007;
- An individualized treatment plan dated January 5, 2007;
- An APS in Support of Disability from Bonnie Jones, LCSW-C, dated March 23, 2007;
- An APS in Support of Disability from Dr. Zimnitzky, dated March 26, 2007.

These forms revealed that Plaintiff had a GAF score of 32, suggesting a serious

impairment in functioning, and was taking chronic regimens of Klonopin, Ativan, and Lexipro.

AR at 395-96.  Records from Threshold Services dated June 4, 2006, indicated Plaintiff had low

energy, occasional suicidal ideation, and moderately high anxiety. AR at 396.  Notes from Dr.

Grodsky dated June 13, 2006, stated that Plaintiff had major depression, suicidal ideation, and

decreased energy, interest and concentration. *Id.* Medical records indicated that in August 2006,

Plaintiff was stable and only reported suffering from sleeping issues.  *Id.*  However, a report

dated October 24, 2006 revealed that Plaintiff was again isolative, depressed, and sleepy. *Id.*

Threshold Services reported on November 29, 2006 that Plaintiff had apathy, no motivation, and

a histrionic personality. On January 2, 2007, Plaintiff was found to be stable with no issues, and

his visits with Threshold Services were reduced to once every two months. *Id.*

However, Plaintiff appeared not to be improving during his subsequent visits on February

27 and March 19, 2007. Specifically, Threshold Services stated during this period that Plaintiff is

suffering from major depression disorder and that his depressive symptoms preclude him from

working. *Id.* On March 23, 2007, Plaintiff's social worker indicated that Plaintiff "does not do an

adequate job washing the dishes, let alone any sustained mental tasks," including driving.  *Id.*

To help make its determination on whether to award benefits, MetLife consulted Dr.

Marcus Goldman, M.D., a board-certified psychiatrist, to evaluate the medical records that

Plaintiff submitted. AR at 395-400.  Dr. Goldman found that from December 24, 2005 to May

22, 2006, "there simply were no narrative progress notes for review." AR at 399.  Dr. Goldman

also noted that subsequent progress notes after May 22, 2006 did not reveal "compelling

observable signs consistent with severe psychopathology." *Id.* Dr. Goldman further determined

that there were "no quantified data to support impaired concentration or other cognitive

functions." *Id.*

In addition, MetLife referred the job description information submitted by Plaintiff on

appeal for review by a Vocation Rehabilitation Consultant (hereinafter "VRC").  AR at 341.  The

VRC determined that Plaintiff's occupation requires "the ability to analyze information and evaluate results to choose the best solution and solve problems." *Id.* The VRC determined that in order to adequately perform his job, Plaintiff needed to maintain certain skills such as "being able to interpret the meaning of information for others, analytical thinking, and dealing calmly and effectively with high stress situation[s]." *Id.*

Because Dr. Goldman's report noted that there were limited medical records on file from December 24, 2005 to March 23, 2006,[4] MetLife informed Plaintiff's counsel that it needed visit notes, letters, and testing from Dr. Wei, who served as Plaintiff's treating physician in China during that time. AR at 724. On April 19, 2007, Plaintiff's counsel informed MetLife that she did not expect additional information to be available from Dr. Wei, but that if additional records became available, she would submit them in the future. *Id.* Plaintiff's counsel instructed MetLife to proceed with the appeal review. *Id.* On May 23, 2007, MetLife sent a letter in English and translated into Mandarin to the address listed on Dr. Wei's APS form to request these medical files, but received no response.[5] AR at 381. However, on May 30, MetLife received a letter from Plaintiff's counsel that enclosed a letter dated May 18, 2007 and signed by Dr. Wei, stating in English that "doctors do not keep medical records for outpatients in China." AR at 391.

On July 5, 2007, MetLife upheld the original determination to deny long-term benefits to Plaintiff. AR at 340.  MetLife used the VRC's job description in place of Plaintiff's submitted job description to analyze whether Plaintiff could perform his occupation. *Id.* MetLife indicated that Plaintiff lacked the necessary medical information to support that he was unable to perform the duties of his occupation due to sickness during throughout his Elimination Period (December 24, 2005 through March 24, 2006) and for the first twenty-four months of long-term disability

---

[4]This is the 90-day elimination period under the Plan for which Plaintiff must show disability but is not entitled to benefits.

[5] The Post Office returned MetLife's letter to Dr. Wei as undeliverable on May 31, 2007.  *See supra*, n.1.

benefits. AR at 343.  MetLife concluded the letter by notifying Plaintiff that all of the

administrative remedies under the Plan were exhausted, that MetLife would not consider any

further appeals, and that Plaintiff had the right to bring a civil action under section 502(a) of the

Employment Retirement Income Security Act of 1974.  AR at 344.


        E.       <u>MetLife's Third Review of Plaintiff's Claim</u>

Shortly after receiving the denial of appeal notice, Plaintiff's counsel notified MetLife

that Plaintiff had recently returned from China and obtained the Chinese medical records from

Dr. Wei's office that MetLife had requested during the appeal. AR at 319-34.  These records

included the SAS, SDS and SCL-90 charts that Dr. Wei's APS form referenced but did not

attach. AR at 297-301.  Independently, MetLife obtained a translation of these records and

submitted the records to Dr. Goldman for a second review. AR at 284-87.  Dr. Goldman found

that the evidence presented a "very compelling mental illness." AR at 277. On September 24,

2007, due to this new information, Dr. Goldman revised his report to reflect that the medical

records supported Plaintiff's functional limitations for the period of December 29, 2005 to June

14, 2006. AR at 275-78, 281.

Accordingly, on December 17, 2007, MetLife granted long-term disability benefits for

the period starting March 24, 2006, the first day Plaintiff became eligible, to June 14, 2006.  AR

at 277-78.  However, MetLife did not find that the medical information supported a finding of

disability after June 14, 2006.  Specifically, MetLife alleges that there was no "compelling

objective data" and that the progress notes by Threshold Services state that Plaintiff was stable

on July, 5, August 2, and August 30, 2006, and that he was working as a computer programmer

in August 2006. AR at 152-54; 512. Plaintiff argues that this progress note or its interpretation is

misunderstood because Plaintiff only worked as a computer programmer prior to his disability. Doc. No. 40 at 12 n.11.

Additionally, MetLife stated that if Plaintiff wished to appeal the denial of benefits beyond June 14, 2006, that he should provide current medical records, test results, and a treatment plan that supported why he was unable to perform the duties of his occupation. AR at 153.  MetLife also suggested that Plaintiff produce any mental status examination information, a current medication regimen, and a statement of current restrictions and limitations. *Id.* MetLife lastly advised Plaintiff that he had 180 days to appeal this decision.  AR at 154.


F.     MetLife's Fourth and Final Review of Plaintiff's Claim

On January 25, 2008, Plaintiff's former counsel appealed MetLife's December 17 decision and subsequently submitted additional medical information dating from April 2007 to January 2008.  AR at 117-20; 97-112. These records contained progressive notes, mental status exams, an individual treatment plan, and updated medication records from Dr. Zimnitzky and Dr. Morris at Threshold Services.  AR at 99-112.

Specifically, these records indicate that on April 10, 2007, doctors reported Plaintiff was "doing well" on the medications and that his mental status exam was "within normal limits."  AR at 112.  On May 8, 2007, however, Plaintiff reported continued depression, and doctors continued to assess him with Major Depressive Disorder and suggested adding Cymbalta to Plaintiff's medication regimen. AR at 111.  On June 4, Plaintiff reported improvement in mood and energy and doctors advised to continue his medications as usual. AR at 110.

However, Plaintiff's mental health subsequently appeared to decline. On July 24, 2007, the individual treatment plan indicated that Plaintiff "looks and acts just as depressed as he did

six months ago," that Plaintiff could not work, and that his current GAF score was 28, suggesting

serious impairment in functioning. AR at 108-09.  On July 25, Plaintiff's mental status exam was

not within normal limits and he expressed suicidal ideation.  AR at 107.  On August 28, 2007,

Plaintiff reported that the increased Cymbalta dosage helped him, but refused Dr. Morris'

suggestion to increase sleeping medication and decrease the anti-depression medication.  AR at

106.  On October 1, 2007, Dr. Morris recommended that Plaintiff decrease his visits to every two

months but increase his Cymbalta dosage.  AR at 105.  On October 24 and December 10, 2007,

Plaintiff appeared stable.  AR at 104-05.  On January 14 and January 22, 2008, Dr. Morris

indicated that Plaintiff continued to suffer from Major Depressive Disorder and General Anxiety

Disorder, was not stable, and felt suicidal.  AR at 101-02.

MetLife hired a new psychiatrist consultant, Dr. Randy Rummler, M.D., to evaluate

Plaintiff's newly submitted information. On February 21, 2008, Dr. Rummler contacted Bonnie

Jones, Plaintiff's social worker at Threshold Services, to discuss Plaintiff's condition. AR at 82-

83.  Ms. Jones indicated during this teleconference that Plaintiff had been extremely depressed

over the last six months but that his condition had "slightly improved." AR at 75.  Jones also

noted that since being in treatment, Plaintiff had not had suicidal ideation or psychotic

symptoms, but that he remained unable to concentrate. AR at 76.  Jones also stated that she

"questioned the reliability of symptoms due to a drastic change in functioning and has wondered

if the [Plaintiff] is malingering due to lack of response to treatment." *Id.*

After reviewing Plaintiff's records, Dr. Rummler concluded that the record did not

"support the overall finding of lack of functional impairment and consistency of presentation."

AR at 78. Dr. Rummler noted that "the claimant presented in an inconsistent manner to

providers, with psychiatric notes often reflecting stable or improved mood and the therapist

stating the claimant showed no improvement and per verbal communication has only shown minimal change to date." AR at 85.  Dr. Rummler also noted that Plaintiff presented himself as unable to get out of bed but had the energy to fly to China to obtain medical records and return with such records. AR at 78. Dr. Rummler also noted the inconsistency regarding the medical records from China, where Plaintiff's counsel had stated that no such records existed, but Plaintiff was later able to procure such records. *Id.* Dr. Rummler found questionable the fact that not even Plaintiff's wife had corroborated Plaintiff's history. *Id.* Dr. Rummler also cited the fact that there had not been any effort by Threshold Services to quantify Plaintiff's cognitive abilities, and Plaintiff's medical records contained a lack of objective evidence consistent with severe psychiatric impairment, such as inpatient hospitalization. *Id.* Finally, Dr. Rummler found that the statement from Jones that Plaintiff may be malingering suggested issues with Plaintiff's credibility. AR at 79.

According to MetLife, a copy of Dr. Rummler's report was faxed to Bonnie Jones and Plaintiff's counsel. AR at 72.  MetLife advised Jones to submit her comments, and stated that if she was not in agreement with the report, to submit clinical evidence in support of her conclusions by March 6, 2008. AR at 64.  On March 18, 2008, MetLife indicated to Plaintiff's counsel that Jones had contacted MetLife about submitting additional medical information and that MetLife may need a forty-five day extension to complete the evaluation. AR at 68.  Three days later, on March 21, 2008, MetLife denied Plaintiff's claim for the reasons set forth by Dr. Rummler. AR at 71.  On the same day, Plaintiff's counsel contacted MetLife to request that it refrain from making a decision because Ms. Jones and the Plaintiff's doctor, Dr. Morris, had opinions different from that of Dr. Rummler. (AR 67).  However, MetLife had already rendered its decision.

G.    Information Submitted after MetLife's Fourth and Final Review

Plaintiff's current counsel contacted MetLife on April 30, 2009 to inform MetLife that he

had replaced former counsel. AR at 37-53. At this time, Plaintiff's current counsel submitted

new records for review dating from April 28, 2008- April 15, 2009. AR at 40-53.  Counsel

advised MetLife that Plaintiff intended to sue MetLife under ERISA, and requested a copy of

Plaintiff's entire claim file. AR at 37.  On May 26, 2009, MetLife complied with this request and

informed Plaintiff's counsel that it would re-open the review process and conduct one further

review all the materials. AR at 1. However, before MetLife began reviewing the new records,

Plaintiff filed this civil action.

Plaintiff claims that Defendant failed to provide a full and fair review as required by 29

U.S.C. § 1133, and seeks long-term disability benefits from June 15, 2006 until the date of trial,

as well as a declaration that the benefits continue to be payable to Plaintiff at a rate of $5,000.00

per month until age 66.


II.    **STANDARD OF REVIEW**

ERISA actions are usually adjudicated on summary judgment rather than at trial. *Carden*

*v. Aetna Life Ins. Co.*, 559 F.3d 256, 260 (4th Cir.2009). Summary judgment is only appropriate

"if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

The Court must "draw all justifiable inferences in favor of the nonmoving party, including

questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New*

*Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). On cross-motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

A.    Abuse of Discretion Standard of Review

In reviewing a claim of wrongful denial of benefits under ERISA, the court must first determine whether that plan vested MetLife with discretion to determine eligibility of the contested benefits. *See Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 638 (4th Cir. 2007). The court makes this determination *de novo. Id.* If the court determines that the plan confers discretionary authority on the plan administrator, then the court reviews the plan administrator's decision under an abuse of discretion standard. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315 (4th Cir. 2008).

In order for the abuse of discretion standard to apply, the plain language of MetLife's Plan must show a clear intention to confer discretionary authority, and any ambiguity is

construed against the drafter and in accordance with the reasonable expectations of the insured. *Gallagher v. Reliance Standard Life Ins. Co.*, F.3d 264, 268-69 (4th Cir. 2002). If the court determines that an abuse of discretion standard is proper, the court is "limited to evidence that was before the plan administrator at the time of the decision." *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994).

Although Plaintiff asserts that the Plan does not confer discretion, the Plan language provides at least one distinct provision which independently grants MetLife the clear right to construe the terms of the plan and determine employee benefits eligibility. The Plan provides that "In order to receive benefits under This Plan, you must provide to us at your expense, *and subject to our satisfaction*, all of the following documents." AR at 677 (emphasis added). Both parties cite to *Gallagher*, a Fourth Circuit case in which the court construed language in a plan similar to the language at issue. The plan in *Gallagher* provided for benefits to be paid if the insured "submits satisfactory proof of Total Disability to us." 305 F.3d at 269. The court found that language to be ambiguous because "to us" could indicate: (1) merely the location as to where the proof would be sent; or (1) that the insurer, "us," has discretion to determine whether the proof is satisfactory. *Id.* at 269-70. Given the ambiguity, the court construed the language against the insurer. *Id.*

Unlike the ambiguous language in *Gallagher*, MetLife's proof provision appears to grant clear discretion to MetLife to determine whether proof of disability is satisfactory. The language in the Plan at issue does not indicate to where a claimant must submit his or her proof but rather states that the proof provided must be "subject to our satisfaction." AR at 677. Put into context, the Plan states: "In order to receive benefits under This Plan you must provide to us at your expense, and subject to our satisfaction, all of the following documents . . ." *Id.* Plaintiff argues

that "subject to our satisfaction" modifies the word "documents." Doc. No. 40 at 4. This Court finds Plaintiff's interpretation to be at odds with the plain meaning of the words and is convinced that a claimant would be far more likely to understand the phrase as granting MetLife discretion over whether the proof submitted was satisfactory. Because the plain meaning of the Plan's language appears to grant MetLife the right to subjectively determine whether proof of disability is satisfactory, MetLife has discretionary authority to make such determinations, and this Court will accordingly review MetLife's determinations under an abuse of discretion standard.

Other courts have reached the same result when construing similar proof provision language found in other ERISA plans. In *Bartel v. Sun Life Company of Canada*, the court found the phrase "proof must be satisfactory to Sun Life" to grant Sun Life the discretion to determine whether proof of a disability was satisfactory. 536 F. Supp. 2d 623, 628 (D. Md. 2008); *see also Mitnick v. Sun Life Assur. Co. of Canada*, No. Civ.A. MJG-01-669, 2003 WL 21649668 at *5 (D. Md. Mar. 4, 2003) ("In the Policy here at issue, the 'satisfactory proof' standard states specifically that 'proof must be satisfactory to us.' The Court finds this language to be unambiguous in stating that Sun Life shall have the discretion to determine what proof satisfactorily establishes a claimant's right to benefits.").

Under the abuse of discretion standard, this Court must determine whether MetLife's denial of benefits was reasonable. *See Groft v. Health Care Corp.*, 792 F. Supp. 441, 442 (D. Md. 1992) ("The ultimate inquiry is one of reasonableness, and, if the fiduciaries' determination is reasonable it is entitled to stand, even if a contrary determination would have been more reasonable."). In determining reasonableness, the Court is limited to considering only such evidence as was before the claims administrator at the time its decision was made. *See*, *e.g.*, *Sutton v. Hearth & Home Distrib., Inc.*, 881 F. Supp. 210, 215 (D. Md. 1995).

B.      Conflict of Interest

After determining the proper standard of review, the Court must determine whether a

conflict of interest exists. The Fourth Circuit has stated that "when an administrator or fiduciary

with discretion is operating under a conflict of interest such that its decision to award or deny

benefits impacts its own financial interests, 'that conflict must be weighed as a facto[r] in

determining whether there is an abuse of discretion.'" *Bernstein v. CapitalCare, Inc.*, 70 F.3d

783, 787 (4th Cir. 1995) (quoting *Firestone*, 489 U.S. at 115). Because MetLife is both the

insurer and administrator of the Plan in this case, the Court will weigh this apparent conflict of

interest as a factor in determining the reasonableness of MetLife's decision.


III.    **ANALYSIS**

This Court is tasked with determining whether, at each juncture where MetLife denied

benefits to Plaintiff, MetLife's decision was reasonable and not an abuse of discretion.

Accordingly, the Court will proceed by evaluating each of MetLife's decisions at these crucial

junctures, given the information before MetLife at the time, to determine whether MetLife's

decisions were reasonable.


A.      MetLife Did Not Abuse its Discretion in Denying Plaintiff's Initial Claim

On August 31, 2006, MetLife denied Plaintiff's initial claim for long-term benefits,

stating that there was not enough objective medical information to conclude that Plaintiff had a

serious psychiatric disorder that would prevent him from performing the essential duties of his

occupation.[6] AR at 456. The information before MetLife at the time consisted of: (1) a statement by Plaintiff's attending physician in China that Plaintiff had depressive disorder and "it will take 1 or 2 years to cure this kind of illness," AR at 492; (2) a statement by Dr. Grodsky to the same effect and additionally noting that he had not advised Plaintiff to return to work because Plaintiff's concentration was too poor, AR at 664; and (3) a phone interview with Plaintiff in which Plaintiff stated that he had become depressed while in China but was doing better presently. Metlife based its denial of benefits on the fact that there were no mental status exams or recent symptoms documented to support restrictions on Plaintiff's functionality, and there were no office visits or progress notes to document his being continuously disabled from his last day of work.

Under MetLife's Plan, Plaintiff had the burden of proving that, due to his depressive disorder, he was unable to earn more than 80% of his pre-disability earnings, and that he was receiving appropriate care and treatment from a doctor on a continuing basis. AR at 680. Plaintiff claimed to be totally disabled and to suffer from a serious and debilitating condition. However, at this initial review stage, Plaintiff was not able to procure any medical records from his attending physician in China, including progress notes or the SAS, SDS, and SCL-90 charts that evidenced the extent of his depression. Furthermore, Plaintiff's statements during the August 15, 2006 phone interview with the psychiatric specialist, that he was no longer experiencing suicidal inclinations or hallucinations, was sleeping better, and that his thought process was clear, are inconsistent with someone who is totally disabled by debilitating depression.

Given the information available to MetLife at the time, the Court finds that, regardless of whether the Court would have made the same determination, it was reasonable for MetLife to

---

[6]The two-year period of coverage for the Plaintiff would have been from March 24, 2006 - March 24, 2008. Under the terms of the Plan, the Plaintiff was subject to an "Elimination Period" for the first 90 days of illness resulting in disability, during which no benefits are payable. AR at 675, 679.

determine that there was insufficient evidence to support Plaintiff's claim of total disability.

Thus, MetLife did not abuse its discretion in denying Plaintiff's initial claim for benefits.

B.  <u>MetLife's Second Denial of Plaintiff's Claim</u>

On July 5, 2007, MetLife upheld its initial denial of Plaintiff's claim for long-term

benefits, citing that Plaintiff had not submitted the necessary medical information to support that

he was unable to perform the duties of his occupation due to sickness from December 24, 2005

through March 24, 2006 and beyond. AR at 343. The information before MetLife at this time

included: (1) extensive information from Bonnie Jones, Plaintiff's social worker, suggesting that

Plaintiff had moderately high anxiety, occasional suicidal ideation, and low energy, AR at 396;

(2) medical records from May 24, 2006 to January 2, 2007 suggesting Plaintiff was taking

chronic regimens of Klonopin, Ativan, and Lexipro, AR at 395-96; and (3) two additional

statements in support of disability: one by Plaintiff's social worker, dated March 23, 2007, and

one by Dr. Ziminzky, dated March 26, 2007.

In citing the reasons for its denial, MetLife stated that the record presented by Plaintiff

lacked sufficient clinical medical information to support a finding of symptoms so severe that

Plaintiff was unable to perform the duties of his occupation. AR at 340-344. MetLife also

deferred to its consulting psychiatrist who determined that the information submitted by Plaintiff

was largely subjective and self-reported. AR at 399. The Court finds that MetLife failed to

adequately consider that a claim of disability due to depression is fundamentally different from

other types of disability claims that can be proved solely through a clinical medical record.

Unlike a broken bone or a heart attack, depression is a disease which relies largely on self-

reported symptoms. In this context, given Plaintiff's albeit self-reported symptoms, Plaintiff's

doctors were able to diagnose him with major depression and found that Plaintiff was unable to work due to poor concentration. AR at 455-56, 491-93, 664-66.

However, MetLife also denied Plaintiff's claim because MetLife was presented with conflicting information as to whether Plaintiff suffered from a constant and continuing disability that rendered him totally disabled during the benefits period. For example, notes from Dr. Grodsky dated June 13, 2006 state that Plaintiff had Major Depression, suicidal ideation, and decreased energy, interest, and concentration, while Plaintiff indicated to MedLife's psychiatric specialist in August 2006 that Plaintiff was sleeping better and was only experiencing concentration problems while watching television. Because the Plan requires "evidence of *continuing* Disability," MetLife found that the conflicting information served as a basis to deny Plaintiff's claim. However, this Court recognizes that "major depressive episode" is a disorder characterized by a "depressed mood most of the day, nearly every day." *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR* 356. Although Plaintiff's medical records suggest that he was sleeping better and stable during August 2006, this does not mean that Plaintiff was cured of the debilitating depression he was diagnosed with only two months before.

In fact, the medical records clearly show that Plaintiff was isolative, depressed and sleepy in October 2006 and had apathy, no motivation, and a histrionic personality in November. On February 27 and March 19, 2007, Threshold Services stated that Plaintiff has Major Depression Disorder and that the depressive symptoms preclude him from working. AR at 396. On March 23, 2007, Plaintiff's social worker indicated that Plaintiff "does not do an adequate job washing the dishes, let alone any sustained mental tasks," including driving. *Id.* Thus, the overwhelming evidence available to MetLife at the time of MetLife's first review suggested that Plaintiff continued to suffer from debilitating depression.

In sum, MetLife disregarded the medical diagnoses and conclusions of Plaintiff's attending physician and social worker in favor of the opinions by MetLife's independent psychiatrist, Dr. Goldman, in denying Plaintiff's claim. Dr. Goldman, who did not treat Plaintiff but evaluated Plaintiff's medical records, determined that Plaintiff's claims of disability were not supported because the record contained "simply no narrative progress notes to review" and because the doctor found that the information from May 22, 2006 forward was comprised largely of Plaintiff's subjective and self-reported complaints. AR at 399. MetLife argues that under *Robinson v. Phoenix Home Life Mutual Insurance Co.*, an administrator exercising its discretion may decide to give more weight to objective medical findings than to determinations based on subjective complaints. Doc. No. 38 at 24; *see* 7 F. Supp. 2d 623, 633 (D. Md. 1998). However, that case involved a claimant who suffered from fibromyalgia and myfasical pain syndrome rather than a mental disability, as is the case here. *Robinson*, 7 F. Supp. 2d at 626.

Furthermore, MetLife did not merely give more weight to objective medical findings over subjective complaints, but proceeded to wholly disregard, among other things: (1) Plaintiff's submissions showing that he had a GAF score of 32, where any score below 50 shows a serious impairment in functioning, and (2) statements by Plaintiff's attending physician and social worker supporting a lack of sufficient cognitive function to return to work.

Because MetLife's second denial improperly ignored the weight of evidence submitted by Plaintiff's physician and social worker, the Court is unable to find that MetLife was reasonable in its decision to deny Plaintiff's claim for a second time.

C.      MetLife's Third Denial of Plaintiff's Claim

On December 17, 2007, MetLife granted Plaintiff's claim for long-term disability

benefits for the period of March 24, 2006 to June 14, 2006.[7] AR at 152-54. Although MetLife

found that new data provided by Plaintiff's physician in China supported psychiatric functional

incapacity from December 29, 2005 to June 14, 2006, it found that there was insufficient

evidence to support a finding of disability after June 14, 2006.

For the same reasons stated above, the Court finds that MetLife's third denial improperly

ignored the weight of evidence submitted by Plaintiff's other physician and social worker. A

proper review at this stage would consider Plaintiff's claim of totally disabling depression in the

context of the corroborating evidence submitted by Plaintiff, which MetLife's own consulting

psychiatrist found to support a "very compelling mental illness." AR at 277.

D.       MetLife's Fourth Denial of Plaintiff's Claim

On March 21, 2008, MetLife conducted another review and again denied Plaintiff's claim

for long-term disability benefits for the period of June 15, 2006 to March 24, 2008.[8] In denying

Plaintiff's claim a fourth time, MetLife relied upon the opinion of a new psychiatrist consultant,

Dr. Rummler, who reviewed Plaintiff's records and concluded that no psychiatric functional

limitation was supported by medical records after June 14, 2006. The information before

MetLife at this time included new medical information from April 2007 to January 2008,

---

[7]Note that Plaintiff had no claim to any benefits before March 24, 2006, as this is considered the "Elimination Period" under the Plan. AR at 678.

[8]As discussed *supra*, n.5, the two-year period of coverage for Plaintiff would have been from March 24, 2006-March 24, 2008. On December 17, 2007, MetLife awarded Plaintiff disability benefits from March 24, 2006- June 14, 2006. Thus, had MetLife granted Plaintiff's latest appeal, Plaintiff would have received benefits through March 24, 2008. The two-year cap is due to provisions of the Plan which limit monthly benefits for disabilities due to mental disorders or diseases to 24 months during the claimant's lifetime, unless the disability results from schizophrenia, bipolar disorder, dementia, or organic brain disease. Although Plaintiff was diagnosed with bipolar disorder on September 26, 2008, MetLife never had a chance to review or make a determination based on this information as Plaintiff filed suit shortly after submitting these records to MetLife. Thus, as discussed *infra*, on remand MetLife will only be required to reconsider the evidence before it up through its March 21, 2008 decision, which necessarily limits Plaintiff to claims based on the two-year period of coverage.

including progress notes, mental status exams, an individual treatment plan, and updated medication records. AR at 99-112. The records revealed that Plaintiff's physicians continued to assess him with major depressive disorder, and Plaintiff continued to have a GAF score of less than 50, suggesting serious impairment in functioning. AR at 108-09, 395-97. Dr. Rummler cited to the fact that Plaintiff was consistently reported as "stable" and "doing well on medications." AR at 82-93.

Additionally, Dr. Rummler noted inconsistencies in Plaintiff's claims; for example, Plaintiff presented himself as unable to get out of bed but somehow had the energy to go to China during the summer of 2007 and come back with medical records. The doctor also noted that "the claimant presented in an inconsistent manner to providers, with psychiatric notes often reflecting stable or improved mood and the therapist stating the claimant showed no improvement and per verbal communication has only shown minimal change to date." AR at 85. The doctor also noted a statement by Plaintiff's social worker that Plaintiff wasn't responding as expected to his course of treatment and maybe he was malingering. Finally, Dr. Rummler noted that there had still been no effort to quantify Plaintiff's cognitive abilities, and there was no objective evidence that Plaintiff required inpatient hospitalization commensurate with severe psychiatric impairment. AR at 78.

This Court finds MetLife's denial of Plaintiff's claim and sole reliance on the opinion of Dr. Rummler over the medical data and opinions of Plaintiff's treating physicians to be unreasonable. First, the fact that Plaintiff traveled to China, the place where his mother had recently passed away and he presumably has family, is not inconsistent with his claims of total disability. Those claims are amply supported by his medical records and notes by his treating physician and social worker. Furthermore, the fact that Plaintiff's condition is cited as "stable,"

i.e. showing little or no improvement, suggests that he continued to suffer from major depressive disorder. This is consistent with statements by Plaintiff's therapist that Plaintiff remained "extremely depressed" and "looks and acts just as depressed as he did six months ago." AR at 55, 108-09.

Finally, this Court finds that although MetLife had no obligation to send Plaintiff for an independent medical examination, a reasonable review would have involved such an examination in this case. Because depression is a disease that encompasses inherently subjective complaints, it was inappropriate for MetLife to continually deny Plaintiff's claim based solely on the opinions of psychiatrists who merely reviewed Plaintiff's file, to the exclusion of statements and diagnoses by Plaintiff's treating physicians, and without an independent medical examination supporting the view of MetLife's psychiatrists.

MetLife's failure to order an independent medical exam is particularly questionable considering that MetLife continually denied Plaintiff's claim based on a lack of objective evidence such as cognitive testing. Throughout the period of 2006-2008, Plaintiff sought medical care from Threshold Services, a reduced fee clinic for adult persons with mental disorders. Unable to work, without health insurance, and without disability benefits, Plaintiff could not be expected to undergo expensive diagnostic testing at every juncture in which his claim was being reviewed in order to prove his mental disease. Other courts have held that where the claimant suffers from a disability condition encompassing subjective complaints, an independent medical examination is appropriate. *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263, 264 (6th Cir. 2006) (finding that where a claims administrator denied a disability claim based on depression and other ailments, it "could have obtained an independent medical examination to evaluate [the claiminat's] pain. Their decision to not perform this examination supports the finding that their

26

determination was arbitrary."); *see also Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F.

Supp. 2d 546,560 (2009); *Zanny v. Kellogg Co.*, No. 4: 05-CV-74, 2006 WL 1851236, at *9

(W.D. Mich. June 30, 2006).

Thus, this Court finds that MetLife's fourth denial of Plaintiff's claim contains the

trappings of unreasonableness because it fails to fully and fairly consider the medical opinions

and diagnoses of Plaintiff's treating physicians or an independent medical examination. The

court accordingly remands to MetLife for reconsideration, consistent with this opinion, of all

evidence submitted by Plaintiff, including evidence submitted after MetLife's final March 21,

2008 denial, which MetLife agreed to review.

 

     F.    <u>Remand</u>

The Fourth Circuit has held that "the administration of benefit and pension plans should

be the function of the designated fiduciaries, not the federal courts." *Bernstein v. Capital Care,

Inc.*, 70 F.3d 783, 788 (4th Cir.1995). When, as here, a plan administrator fails to comply with

ERISA's procedural guidelines to provide "full and fair review" of a claim for disability

benefits, "the proper course of action for the court is remand to the plan administrator" to

provide such review. *Weaver v. Phoenix Home Life. Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir.

1993). Remand is "most appropriate whe[n] the plan itself commits the trustees to consider

relevant information which they failed to consider or whe[n] the decision involves records that

were readily available." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir.1999).

Given this policy of favoring resolution by the plan administrator, and MetLife's failure

to adequately consider the medical records, opinions, and diagnoses presented by Plaintiff's

treating physicians or to conduct an independent medical examination, considering the nature of

the claim, remand is appropriate so that Plaintiff's claim can be decided after the "full and fair review" ERISA requires. *See, e .g.*, *Hardt v. Reliance Standard Life Ins. Co.*, 540 F.Supp.2d 656, 664 (E.D. Va. 2008) (remanding a long-term disability claim when denial was not based on adequate consideration of evidence).

Accordingly, this matter will be remanded to the administrator for a full and fair review of the opinions and medical diagnoses of Plaintiff's treating physicians which MetLife failed to fully consider in its second, third, and fourth reviews of Plaintiff's claim. Specifically, MetLife must give full and fair consideration to the opinions and diagnoses rendered by: (1) Bonnie Jones, from May 22, 2006 through April 30, 2009; (2) Dr. Olaciregui, if available; and (3) Drs. Zimnizky and Morris from around April 10, 2007 to April 30, 2009. In addition, MetLife should consider Plaintiff's claims of continuing debilitating depression in the context of the findings by MetLife's own consulting psychiatrist, affirmed by MetLife, that Plaintiff at least suffered from a "very compelling mental illness" from December 29, 2005 through June 14, 2006.

    E.    <u>Upon Remand, MetLife Must Give Full and Fair Consideration to All Evidence Submitted by Plaintiff, Including Evidence Submitted after Plaintiff's Fourth Denial that MetLife Agreed to Review</u>

On April 30, 2009, Plaintiff's current counsel contacted MetLife and submitted new records dated from April 28, 2008- April 15, 2009, which MetLife agreed to consider in a subsequent review. However, the subsequent review never occurred because Plaintiff filed the present action before MetLife had an opportunity to consider the additional evidence. Under the abuse of discretion standard, this Court's review is limited to determining the reasonableness of the administrator's decision based on the facts known to it at the time. *See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120 (4th Cir. 1994). MetLife was not in receipt of the

new records, including Plaintiff's September 28, 2008 diagnosis of bipolar disorder, at the time it

rendered its final denial. Thus, the Court declines to consider this evidence in determining the

reasonableness of MetLife's denials. However, because MetLife agreed to review this new

information, including information regarding Plaintiff's diagnosis of bipolar disorder, these

records will be included in the administrative record on remand. This allows MetLife the benefit

of considering all evidence available to it in rendering a full and fair review.

Thus, the administrative record on remand should contain all records submitted on or

before April 30, 2009 in determining whether Plaintiff is entitled to the remaining unawarded

portion of the two-year coverage period (June 15, 2006- March 24, 2008).


**III.**   **CONCLUSION**

For the reasons stated above, the parties' cross motions for summary judgment will be

denied, and Plaintiff's claim will be remanded to MetLife for a full and fair consideration of the

opinions and medical diagnoses of Plaintiff's treating physicians, consistent with this opinion. A

separate order will follow.


_____September 2, 2011_____                    _____/s/_____
            Date                                          Alexander Williams, Jr.
                                                          United States District Judge


29